UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GARY ALBERT TOTI,

    Plaintiff,

v.

MICHAEL MARTEL,

    Defendant.

Case No. 18-cv-02870-RS

**ORDER DENYING WRIT OF HABEAS CORPUS**

# I. INTRODUCTION

Petitioner Gary Toti seeks federal habeas relief from his state convictions. For the reasons set forth below, the petition for such relief is DENIED.

# II. BACKGROUND

In March 2011, victim Emma Doe told her mother she had "sex with grandpa" referring to Toti. (Ex. 6 at 2.)[1] An investigation began. Emma spoke to Officer Kirsten Ryn about the incident alone. Officer Ryn testified, "She told me that her grandfather had stuck his doodle in her butt, that it hurt when he put it all the way in, that, sometimes, it would be sticky when he took it out." (*Id.*) "Doodle" referred to Toti's penis. In April 2011 Emma made a pretext call to Toti telling him she did not want to have sex anymore. (*Id.*) Toti responded "[w]ell if you don't be crazy anymore and I know that's inappropriate and we won't do that." (*Id.*) Toti was arrested for

---

[1] "Ex. _" = Exhibit lodged by Respondent followed by exhibit number.

four counts of child molestation and interviewed by the police. During the interview, the investigating officer informed Toti of his Miranda rights and Toti agreed to give a statement at that time. There was no indication Toti was confused or misunderstood his rights. The only factor Toti disclosed that may affect his answers was that his back was a "little tight." (Ex. 1, vol. 4, attach. B at 1.) Toti admitted to some inappropriate sexual touching and admitted his penis touched Emma's bottom, but denied there was any penetration.

At trial, Emma testified against Toti saying he "molested" her. The prosecution also called an expert on child sexual abuse accommodation syndrome ("CSAAS") to bolster Emma's credibility. James Reilly, Toti's counsel, decided his best defense was to convince the jury Emma was lying. To do this, Reilly cross-examined Emma over the span of two days. The defense also called Toti to testify. He denied sexually abusing the victim and claimed he cannot achieve an erection because of erectile dysfunction. His wife corroborated his testimony and various character witnesses testified on Toti's behalf. The defense did not, however, call their own CSAAS witness to rebut the prosecution's CSAAS witness. Instead, Reilly relied on cross-examination of the prosecution's witness as he had experience cross-examining "somewhere around 10" CSAAS experts in prior cases and knew how to debunk the science behind it. (Ex. 10, ex. B 2 RT 97.) In fact, Reilly decided not to consult with a CSAAS expert at all, and likewise did not contact an expert to explain or testify as to why Emma lied. Reilly similarly did not consult with an expert to conduct tests to determine whether Toti's statements to police resulted from any cognitive impairments.

In August 2012, a jury convicted Toti of two counts of sexual intercourse or sodomy of a child 10 years of age or younger, and two counts of lewd acts with a minor. He was sentenced to 25 years to life in state prison and concurrent sentences were imposed on the remaining counts. In April 2016, Toti filed a petition for writ of habeas corpus in the Marin County Superior Court. (Ex. 10, ex. A.) The court held an evidentiary hearing in April 2017. During the hearing, Reilly testified along with CSAAS expert Dr. Ellen Stein. (Ex. 10, ex. B.) Reilly testified as to his trial strategy and the basis for his decisionmaking at trial. (*Id.*) Dr. Stein testified as to the benefits of

consulting with a CSAAS expert prior to court proceedings. (*Id.*) The Superior Court denied the petition in November 2017. (Ex. 10, ex. A.) In January 2018, Toti filed a petition for writ of habeas corpus in the California Supreme Court which was denied in May 2018. (Ex. 9; Ex. 11.) Toti timely filed this petition in May 2018.

As grounds for federal habeas relief, Toti claims defense counsel James Reilly rendered ineffective assistance by failing to investigate, consult with, or present experts or mental health evidence to: (1) rebut the prosecution's CSAAS expert; (2) discredit the child victim at trial; and (3) exclude Toti's statements to police.

### III. LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously

or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## IV. DISCUSSION

To prevail on a ineffectiveness of counsel claim, a petitioner must establish that (1) counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and (2) he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Accordingly, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland*, 466 U.S. at 693).[2]

Tactical decisions of trial counsel deserve deference when: (1) counsel bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). A court must "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be

---

[2] Toti argues the state court misapplied the prejudice standard by saying "[t]he prejudice prong of the *Strickland* test is no less strict" than the deferential standard applied to trial counsel's performance. (Ex. 10, ex. A at 3.) Instead, Toti emphasizes "[Toti] need not show that counsel's deficient conduct more likely than not altered the outcome of the case," and suggests the prejudice prong is in fact less strict than the standard applied to trial counsel's performance. *Strickland*, 466 U.S. at 693. The state court's holding, however, states "there is no reasonable probability that the jury would have reached a different result even if trial counsel's performance was deficient in any regard." (Ex. 10, ex. A at 4.) This holding is directly in line with the standard articulated in *Strickland*. 466 U.S. at 694 (defining the prejudice prong of an ineffective assistance of counsel claim).

considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation marks omitted).

### A. CSAAS Evidence

Toti argues Reilly's failure to consult a CSAAS expert witness before trial was unreasonable and prejudicial, thereby constituting ineffective assistance of counsel. Toti further argues Reilly's failure to call a CSAAS expert to testify at trial was unreasonable, and the decision to use a CSAAS expert should have been made prior to trial. Reilly admitted during the evidentiary hearing that his strategy was to wait until the prosecution's CSAAS expert testified before deciding whether the defense needed its own CSAAS expert witness. (Ex. 10, ex. B at 2 RT 68-73.)[3] He knew the shortcomings of the science behind CSAAS and believed cross-examination alone would show it was not reliable, assuming the prosecution's expert testified truthfully. (*Id.* at 48-9.) After cross-examination of the prosecution's CSAAS expert, Reilly decided it was not necessary for the defense to call their own CSAAS expert. The California Superior Court denied Toti's claim that this constituted ineffective assistance of counsel citing Reilly's understanding of CSAAS and prior experience with similar experts in similar trials. (Ex. 10, ex. A at 4.)

While Reilly was clearly knowledgeable about CSAAS, Toti argues Reilly's failure to consult with a CSAAS expert unreasonably limited Reilly's investigation into potential defenses. Limited investigations are "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691. When assessing the reasonableness of an attorney's investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). A "heavy measure of deference" is given to counsel's decision not to investigate further. *Strickland*, 466 U.S. at 691.

Here, Reilly's investigation into CSAAS was limited because he did not consult an expert.

---

[3] Reporter Transcript ("RT").

However, the decision not to investigate further or consult an expert was a reasonable, professional judgment. Prior to Toti's trial, Reilly had gained experience in many trials which included CSAAS evidence. Specifically, Reilly testified to handling around twenty child molestation cases, with about half of those cases including a CSAAS expert. (Ex. 10, ex. B at 2 RT 96-7.) In about half of the cases involving CSAAS experts, Reilly spoke to members of the jury afterwards. (*Id.* at 97.) According to Reilly, none of those juries reported paying any attention to the CSAAS expert. (*Id.* at 82-3.) In other words, Reilly had extensive experience cross-examining CSAAS experts and knew juries did not pay attention to them through prior investigation. Further, Reilly demonstrated during the evidentiary hearing that he understood the science behind CSAAS and could explain the criticisms. (*Id.* at 48-9.) He reasonably believed, based on his prior trials and knowledge, that four out of five CSAAS characteristics did not apply to the victim, and proper cross-examination would sufficiently debunk the scientific theory overall. (*Id.* at 69.) This prior knowledge and experience led Reilly to make the reasonable, professional decision not to investigate needlessly nor to consult an expert in order to learn more about CSAAS. The trial court's denial of this aspect of Toti's claim was reasonable and therefore entitled to AEDPA deference.

Likewise, Reilly's decision not to call a CSAAS expert to rebut the testimony of the prosecution's expert was reasonable. Defense attorneys are not required to call an equal and opposite expert for every prosecution expert. *Harrington*, 562 U.S. at 111. Additionally, habeas relief is unavailable on the grounds that there was nothing to lose by calling an additional expert. *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) (stating there is no "nothing to lose" standard recognized by the Supreme Court).

During the evidentiary hearing, Reilly explained that if presenting a defense expert would have been a "game changer" he would have done so. (Ex. 10, ex. B 2 RT 97.) Again, Reilly decided four out of five CSAAS characteristics did not apply to Toti and a defense expert had little to no value after his cross-examination of the prosecution's expert. (*Id.* at 70-1.) Further, from past experience, Reilly reasonably believed CSAAS experts were not effective, and he had the

necessary knowledge of CSAAS to cross-examine the prosecution's witness. Likewise, there was no legal obligation to call a defense expert to rebut the prosecution's expert, even if there was nothing to lose besides the expense of expert fees. Accordingly, Reilly made the reasonable, tactical decision with consideration of the overall case to rely on cross-examination of the prosecution's witness instead of hiring an additional expert.

Finally, Toti argues Reilly's decision to wait until the prosecution's expert testified to decide whether to call a defense expert was unreasonable. Prior to trial, Reilly did not make the decision to use an expert. He did reach out to a CSAAS expert, Laura Davies, as a preliminary measure to see if she could testify if needed. Ms. Davies "brushed [Reilly] off," and Reilly did not contact any more experts. (*Id.* at 68.) Reilly did not pursue other experts because, as noted, he felt he did not need one unless the prosecution's expert falsely testified. (*Id.* at 48-9.)

Reilly admitted hiring a defense expert was never a "primary forefront consideration." (*Id.* at 71.) Calling a defense expert such as Davies was deemed necessary only if the cross-examination of the prosecution's expert went poorly. Reilly testified to his confidence that if an expert was necessary he would find an expert witness during the trial. Further, since the decision to use the witness was not made prior to trial, Reilly believed no prior disclosure was required. (*Id.* at 73.) In other words, this was not a case of a defense expert determining a witness would be important to a case and then failing to secure that witness. Reilly reached out to a CSAAS expert in case it was necessary for the defense to use one. When he determined it was not necessary after cross-examination of the prosecution's expert, he made the tactical decision not to use one. Accordingly, the state court correctly found this tactical decision not to use an expert was informed and reasonable in light of the circumstances of the case and Reilly's familiarity with CSAAS experts. The state court's denial of Toti's claim was therefore reasonable and entitled to AEDPA deference.

**B.     Reliability of Victim**

Toti next argues the failure to present testimony on secondary gain as Emma's motivation to lie constituted prejudicial ineffective assistance of counsel at trial. Reilly did not consult an

ORDER DENYING WRIT OF HABEAS CORPUS
CASE NO. 18-cv-02870-RS

7

expert to help him prepare for trial in regards to the issues of false memory, confabulation, taint, or secondary gain. (*Id.* at 76-7.) At the evidentiary hearing Reilly admitted consulting an expert on secondary gain would not have interfered with the defense. (*Id.* at 76-7.) Toti argues evidence of false memory, confabulation, taint, or secondary gain may have substantially bolstered Toti's main argument that Emma lied on the stand, and the failure to present such evidence was unreasonable and highly prejudicial.

To combat Emma's testimony, Reilly made the strategic decision to put forth a lying defense instead of a false memory defense. This decision to forego a false memory defense rested on the conclusion that presenting evidence of false memory, confabulation, or taint could confuse the jury by presenting inconsistent theories. Reilly made the strategic decision not to present that evidence based on his experience as a defense trial attorney, his experience defending these types of cases, and the approximately two hundred hours he spent researching for trial. (*Id.* at 99.) At the evidentiary hearing Reilly showed great understanding of secondary gain as a motivation to lie. When asked, Reilly defined the term and contrasted it with false memory, confabulation, and taint. (*Id.* at 54-5, 74-6.) He also testified not to believing this was a secondary gain problem with Emma's testimony. His theory was that Emma simply lied; a strategy not susceptible to expert scientific proof.

At trial Reilly presented evidence of a civil action brought by Emma's father against Toti. This showed the jury there was motivation for Emma's father to tell her to lie. (Ex. 10, ex. B 1 RT at 40.) Additionally, Reilly extensively cross-examined Emma and her parents over multiple days. In other words, Reilly proactively fought to show the jury Emma's father gave her a motivation to lie, and was knowledgeable on the ways to do so.

In order to show Reilly's decisions constituted ineffective assistance of trial, Toti must demonstrate the decisions were objectively unreasonable and prejudicial. *Strickland*, 466 U.S. 687-88, 694. The state court reasonably concluded Toti did not do so. Reilly knew the potential motivations Emma had to lie, and extensively cross-examined all parties involved to show the jury she was lying. Additionally, Reilly presented outside evidence showing the jury potential

secondary gain on the part of Emma's father that may have filtered down to Emma. After a cost-benefit analysis, Reilly reasonably believed the evidence showing a motivation to lie and the impossibilities of Emma's testimony was enough, and no expert's further explanation was needed.

Even assuming Reilly's failure to call an expert witness to explain Emma's motivation to lie was unreasonable, the state court reasonably determined Toti has not satisfied the prejudice prong by demonstrating a substantial likelihood of a different result. *See Harrington*, 562 U.S. at 112; (Ex. 10, ex. A at 4) ("there is no reasonable probability that the jury would have reached a different result even if trial counsel's performance was deficient in any regard."). Toti's witness at the evidentiary hearing, Dr. Stein, testified that an expert should be used to explain the concepts of secondary gain, contamination, and confabulation as an alternate way of understanding why a witness' story changes or why the statement was made. (Ex. 10, ex. B 3 RT at 60.) This, however, does not show a substantial likelihood that if the jury heard further explanation of Emma's potential motivations, their verdict would have changed. Reilly already knew how to explain secondary gain, and presented the theory through evidence of the civil suit. Toti did not point to any admissible evidence that Reilly failed to use, and Reilly did not fail to present the civil suit brought by Emma's father as a reason for Emma to lie. Toti, therefore, did not sufficiently show prejudice from the absence of an expert beyond the forgone opportunity to bolster what Reilly already presented. This is not enough to show a substantial likelihood that the jury's verdict would change if an expert was presented.

In sum, the state court correctly determined that Reilly's decision not to call an expert to explain Emma's motivation further was reasonable. Moreover, the state court reasonably found Toti failed to show prejudice warranting habeas relief. As such, the state court's denial of Toti's claim was reasonable and deserves deference under AEDPA.

### C. Incriminating Statements to Police

Finally, Toti argues Reilly's failure to retain an expert to attempt to prove Toti's statements to police were not voluntary constituted ineffective assistance of counsel. At trial, the prosecution presented an interview between the Novato Police Department and Toti. The police did not put

Toti in handcuffs and he was allowed to put on a sweatshirt. (Ex. 1, vol. 4, attach. B at 1.) Then, the interviewing officer informed Toti he was arrested for four counts of child molestation and gave Toti his Miranda rights. (*Id.* at 5-6.) Immediately after, the officer asked Toti if he understood these rights. (*Id.* at 6.) He responded "[y]es I do" and told the officer he wanted to give a statement with these rights in mind. (*Id.*) Toti admitted to fondling Emma's groin but asserted Emma instigated it. (*Id.* at 12.) He also admitted to an incident where Emma kissed his penis and having his hard penis rub up against her. (*Id.* at 21, 55.) Toti, however, never admitted to penetrating her.

Before trial, Reilly attempted to exclude these statements by arguing they were not voluntary. This "hearty challenge" was denied by the trial court and the statements were allowed in at trial. (Ex. 10, ex. A at 5.) The trial court ruled that the statements were voluntary because the officer was not confrontational or unduly accusatory. The trial court then found Toti's use of prescription drugs did not extinguish his ability to resist the interrogation, and there was no evidence Toti misunderstood any of the questions. Instead, the interview showed Toti's thinking was not impaired or confused, and he was able to answer all of the questions directly. Relatedly, nothing in the record gave Reilly any indication Toti suffered from any cognitive defects.

Dr. Stein testified as to what she would have done had she been hired as an expert to prepare Reilly for the argument to exclude the evidence. Had she been hired, Dr. Stein would have performed psychological testing, including IQ and personality tests, to determine the degree to which Toti was prone to suggestion. (Ex. 10, ex. B 3 RT at 69.) If cognitive deficits were found, Dr. Stein testified she could "present the court with a better understanding of where those deficits are and how they contributed to the way in which the accused expressed himself." (*Id.*) Dr. Stein admitted she did not "have a crystal ball" to tell her whether she would find legally relevant cognitive deficits for the defense. (*Id.* at 71.) Instead, there was merely a "possibility [the tests] would have been helpful." (*Id.*)

Reilly's decision not to use an expert to perform cognitive tests in an attempt to show the court Toti's statements were involuntary was not unreasonable. Reilly received no evidence that

would lead a reasonable lawyer to believe Toti suffered from any cognitive defects. Without such evidence, Reilly is not required to hire an expert to show he possibly had them. *See Strickland*, 466 U.S. at 691 (limited investigations are "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) ("A decision not to pursue testimony by a psychiatric expert, when no mental state defense seems likely, is not unreasonable under *Strickland*."). A contrary decision would wrongly require counsel to hire an expert to undergo cognitive tests in virtually every case.

Even assuming counsel was unreasonable in forgoing expert testimony in an attempt to exclude Toti's police interview, Toti did not show a substantial likelihood of a different result had an expert been retained. *See Harrington*, 562 U.S. at 112 (holding a substantial likelihood of a different result is necessary to fulfill the prejudice prong in *Strickland*). There is no evidence Toti actually has any cognitive defects. Dr. Stein testified that it was merely "possible" Toti suffered from cognitive defects. In other words, it is only possible Toti had any cognitive defects that may have helped Reilly exclude the interview. The mere possibility of unproven cognitive defects does not show a substantial likelihood of a different result in the motion to exclude had tests been performed. Moreover, Toti's statements to the police were not necessarily prejudicial to his overall case. (Ex. 10, ex. B 3 RT at 116-17.) For example, in the interview Toti denied ever sodomizing or penetrating Emma. (*Id.*) These denials directly refuted Emma's testimony which alleged Toti did penetrate her. (*Id.*) As a case turning on who the jury found credible, Toti's denial of certain acts prior to trial that directly refuted Emma's testimony may have helped his case by hurting Emma's credibility. For both reasons, the state court reasonably found there is no substantial likelihood of a different result in the trial had Reilly retained an expert in an attempt to refute the voluntariness of Toti's statements to the police. The state court's denial of the ineffective assistance of counsel claim was therefore reasonable and must be given AEDPA deference.

## V. CONCLUSION

The state court's denial of Toti's claims did not result in a decision that was contrary to, or

ORDER DENYING WRIT OF HABEAS CORPUS
CASE NO. 18-cv-02870-RS

11

involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Toti may seek a certificate of appealability from the Ninth Circuit Court of Appeals. A separate judgment will be entered in favor of respondent.

**IT IS SO ORDERED**.

Dated: April 1, 2019

_____
RICHARD SEEBORG
United States District Judge